UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| SENJIN ABRAHAM, | : | |
| | : | |
| Plaintiff, | : | |
| | : | |
| v. | : | No. 3:05CV00799(DJS) |
| | : | |
| JOHN POTTER, Postmaster General | : | |
| of the United States Postal Service, | : | |
| | : | |
| Defendant. | : | |

## MEMORANDUM OF DECISION AND ORDER

The plaintiff, Senjin Abraham ("Abraham"), brings this action against John Potter, Postmaster General of the United States Postal Service ("the Postal Service"),[1] pursuant to Title VII of the Civil Rights Act of 1964. In the amended complaint, Abraham alleges that he was subjected to an "adverse employment action" motivated by discrimination based on his race and country of national origin; that the Postal Service retaliated against him for previous internal complaints of harassment; and that the Postal Service created, facilitated, condoned and failed to intervene and prevent an openly hostile work environment. The Postal Service has moved for summary judgment pursuant to Rule 56(a) of the Federal Rules of Civil Procedures ("Fed. R. Civ. P."), claiming that: 1) Abraham failed to allege a <u>prima facie</u> case of race or country of origin discrimination under Title VII because he has not demonstrated that he experienced an "adverse employment action"; and 2) Abraham failed to exhaust his administrative remedies for

---

[1] The named defendant in the amended complaint is John Potter, but this case is brought against him only insofar as he, as Postmaster General, represents the Postal Service. Thus, for the purposes of this motion, the court shall refer to the defendant as "the Postal Service."

1

his retaliation and hostile work environment claims. For the reasons set forth herein, the Postal Service's motion for summary judgment **(dkt. # 23)** is **GRANTED in part and DENIED in part**.

## I. FACTS

At all times relevant to the pending matter, Abraham, an Asian male whose country of national origin is India, was a full-time mail handler for the Postal Service at the Southern Connecticut Processing and Distribution Center in Wallingford, Connecticut. He has held the position of mail handler, tow motor operator, equipment operator, and bulk sorter mail handler throughout his postal career.

On February 25, 2004, acting supervisor Suzanne Amendola ("Amendola") assigned Abraham to work as a tow motor operator ("TMO") during his "tour" (i.e., shift) that night at the postal facility. During the course of the tour, the Manager of District Operations, Carl Lund ("Lund"), observed Abraham towing four postal containers ("postcons") at one time. Lund informed Abraham that Postal Service regulations mandated that a maximum of three postcons may be pulled by a tow motor at any one time.[2] Abraham then completed his dispatches in accordance with Postal Service policy.

Abraham began his lunch break that night at 4:00 a.m. Prior to his reassignment, Abraham's regular lunch break had been from 4:00 to 4:30 a.m. TMOs in Amendola's section normally took their lunch break from 3:30 to 4:00 a.m. Amendola had not, however, informed

---

[2]Abraham does not deny that he knew the official postal service policy was that a TMO may pull a maximum of three postcoms. Rather, Abraham argues, and provides supporting evidence in the form of affidavits and depositions of other postal workers, that the unofficial, normal policy at the Wallingford facility was that MTOs would regularly pull four to seven postcons, sometimes in front of supervisors (including Lund), and that no one else had ever been given a formal written warning. Further, Abraham maintains that, on occasion, the supervisors themselves would hook up more than three postcons for the MTOs to pull.

Abraham that TMOs in her section took their lunch break from 3:30 to 4:00 a.m. At around 4:10 a.m., Amendola saw Abraham taking his lunch break and, after informing him that he should have taken his lunch break from 3:30 - 4:00 a.m., asked him if he wanted to go back on the tow motor.[3] Abraham responded that no one had told him that he was supposed to take his lunch at 3:30 - 4:00 a.m., that he took his lunch break at his regular lunch break time of 4:00 - 4:30 a.m., and that he wanted to finish his lunch. Lund then came upon Abraham and Amendola and told Abraham he was not supposed to be on lunch break, as the regular TMO for that shift, who Abraham was filling in for, takes his lunch break from 3:30 - 4:00 a.m. Abraham responded that no one told him that, and that he (Abraham) had already been at lunch for approximately fifteen minutes. Lund responded that from now on, whenever Abraham drives a tow motor in Lund's section, Abraham was to take his lunch at 3:30 - 4:00 a.m. Further, Lund said that Abraham could take his lunch from 4:00 - 4:30 a.m. that night. Amendola was present for the conversation between Lund and Abraham, but did not say anything.

On February 26, 2004, Supervisor Joy Hawkins held a Preliminary Discipline Interview ("PDI") with Abraham regarding his conduct the previous night. Subsequent to this PDI, on March 2, 2004, Abraham received a written notice of a seven-day "paper" suspension for failure to work in a safe manner and failure to follow instructions. A "paper" suspension is a suspension for which the employee does not lose pay or work hours, but which is maintained in an official discipline record. Specifically, Abraham's suspension notice alleges that Lund observed

---

[3] The Postal Service alleges that Amendola issued a direct order to Abraham to return to work and that Abraham refused to follow the instruction by remaining on his lunch break. For the purposes of summary judgment, the evidence of the nonmovant (here, Abraham) is to be believed and all justifiable inferences are to be made in his favor. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255 (1986). Thus, the court will accept Abraham's version of the facts described above, which is supported by deposition testimony and affidavits.

Abraham pulling four postcons at one time with his tow motor, though Abraham admitted knowing that Postal Service policy permitted him to pull only three postcons at one time. Furthermore, the notice alleges that while he was taking his lunch break, Abraham was advised by Amendola that he should return to work, but he refused to obey the instruction in violation of Section 666.51 (Protests) of the "Employee and Labor Relations Manual of the U.S. Postal Service." Section 666.51 reads: "Employees must obey the instructions of their supervisors. If an employee has reason to question the propriety of a supervisor's order, the individual will nevertheless carry out the order and immediately file a protest in writing to the official in charge of the installation, or appeal though official channels."

The written notice of the seven-day "paper" suspension contained the following explanation of the seriousness of the actions:

> While you will not serve time off with this seven (7) day suspension, it has the equivalent degree of seriousness as if you had served time-off without pay. This action is intended to correct the deficiencies described above and should be taken seriously. It is more serious than a letter of warning. Future deficiencies will result in more severe disciplinary action being taken against you. Such action may include a fourteen (14) day time-off suspension or removal form the Postal Service.
> You have a right to file a grievance under the grievance-arbitration procedure set forth in Article 15, Section 2 of the National Agreement within fourteen (14) days of your receipt of this notice.

(Dkt. # 25, Ex B pp. 1-2.)

Per the written notice, Abraham filed a grievance regarding the seven-day "paper" suspension. On April 1, 2004, as a result of a meeting with a Postal Service Labor Relations Specialist and Abraham's union representative, the seven-day "paper" suspension was reduced to

4

a "Letter of Warning."[4] It was also agreed that "if no further incident or discipline arose between April 1, 2004 and September 3, 2004, the Letter of Warning would be further reduced to an "official discussion." An official discussion is not recorded or reflected in an employee's personnel file or discipline file, or other official record.[5]

On March 29, 2004, Abraham filed for pre-complaint counseling with the Postal Service, asserting that the seven-day "paper" suspension was a result of his having been discriminated against based on his race and national origin. On April 20, 2004, Abraham filed a formal complaint with the Postal Service Equal Employment Opportunities Unit ("EEO"), specifically alleging that he was discriminated against based on his race and national origin when he was issued a seven-day "paper" suspension for failure to follow instructions and failure to work in a safe manner. On April 29, 2004, Abraham was advised that his EEO complaint was accepted, as Case No. 1B-065-0015-04.

On April 14, 2005, the Postal Service issued a final agency decision in regards to Abraham's claim, denying his claim. The memo advised Abraham that he could file a civil action in the U.S. District Court if he was dissatisfied with the decision, which Abraham did on May 18, 2005.[6]

## II. DISCUSSION

Abraham claims that the Postal Service violated Title VII of the Civil Rights Act of 1964

---

[4] A seven-day "paper" suspension is more severe than Letter of Warning, and is the second step in the progressive discipline process at the Postal Service. A formal, written reprimand (i.e., Letter of Warning) is the first step.

[5] As a result of Abraham complying with the above conditions, the Letter of Warning was reduced to an official discussion on September 3, 2004.

[6] Abraham filed his amended complaint on July 13, 2005.

5

by:  1) discriminating against him on the basis of his race and country of origin, 2) retaliating against him for filing for previous internal complaints of harassment, and 3) creating, facilitating, condoning, and failing to intervene and prevent, an openly hostile work environment.  The Postal Service argues that summary judgment should be granted on Abraham's substantive discrimination claim because Abraham, by failing to demonstrate that he experienced an "adverse employment action," has not made a prima facie case of discrimination under Title VII.  With regard to Abraham's retaliation claim and hostile work environment claim, the Postal Service argues that summary judgment is appropriate because Abraham failed to exhaust his administrative remedies.  The court shall address the Postal Service's arguments seriatim.

### A. SUMMARY JUDGMENT STANDARD

A motion for summary judgment may be granted "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue of material fact and that the moving party is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56 (c).

Summary judgment is appropriate if, after discovery, the nonmoving party "failed to make a sufficient showing on an essential element of [its] case with respect to which [it] has the burden of proof."  Celotex Corp. V. Catreet, 477 U.S. 317, 323 (1986). "The burden is on the moving party 'to demonstrate the absence  of any material factual issue genuinely in dispute.'" Am. Int'l Group v. London Am. Int'l Corp., 664 F. 2d 328, 351 (2d Cir. 1981) (quoting Heyman v. Commerce & Indus. Ins. Co., 524 F. 2d 1317, 1319-20 (2d Cir. 1975)).

A dispute concerning a material fact is genuine "'if evidence is such that a reasonable jury could return a verdict for the nonmoving party.'"  Aldrich v. Randolph Cent. Sch. Dist., 963 F.2d

520,523 (2d Cir. 1992) (quoting Anderson, 477 U.S. at 248).  The court must view all inferences and ambiguities in a light most favorable to the nonmoving party.  See Bryant v. Maffucci, 923 F. 2d 979, 982 (2d Cir. 1991).  "Only when reasonable minds could not differ as to the import of the evidence is summary judgment proper."  Id.

## B. DISCRIMINATION CLAIM

Abraham alleges that the Postal Service discriminated against him because of his race and country of origin. Specifically, Abraham alleges that he was discriminated against when the Postal Service issued him a seven-day "paper" suspension under the pretext of having violated two work rules: 1) directly disobeying the direct order of a supervisor, which Abraham denies; and 2) pulling more than three postcons, which Abraham alleges is commonly done by white employees who have never been formally warned for the same behavior.

Title VII of the 1964 Civil Rights Act makes it unlawful for an employer to discriminate against an employee based on the employee's race or country of origin.  42 U.S.C. § 2000e et seq.  The Second Circuit has described the applicable legal standard for the evaluation of Title VII claims:

> At the outset, a plaintiff can avoid dismissal by presenting the "minimal" prima facie case defined by the Supreme Court in McDonnell Douglas. This requires no evidence of discrimination. It is satisfied by a showing of membership in a protected class, qualification for the position, an adverse employment action, and preference for a person not of the protected class. . . .  By making out this "minimal" prima facie case, even without evidence of discrimination, the plaintiff creates a presumption that the employer unlawfully discriminated, . . . and thus places the burden of production on the employer to proffer a nondiscriminatory reason for its action. . . .
> On the other hand, once the employer articulates a non-discriminatory reason for its actions, . . . the presumption completely drops out of the picture. . . . The ultimate burden of persuading the trier of fact that the defendant intentionally discriminated . . . remains at all times with the plaintiff. . . .  Thus, once the employer has proffered its nondiscriminatory reason, the employer will be entitled

> to summary judgment (or to the overturning of a plaintiff's verdict) unless the plaintiff can point to evidence that reasonably supports a finding of prohibited discrimination**.**

James v. N. Y. Racing Ass'n, 233 F.3d 149, 153-54 (2d Cir. 2000) (internal quotations marks and citations omitted). With regard to Abraham's substantive discrimination claim, the sole issue raised by the Postal Service in its summary judgment motion is whether Abraham suffered an "adverse employment action."

A plaintiff sustains an adverse employment action if he or she endures a "materially adverse change" in the terms and conditions of employment. Galabya v. New York City Bd. of Educ., 202 F.3d 636, 640 (2d Cir. 2000). "An 'adverse employment action' is one which is more disruptive than a mere inconvenience or an alteration of job responsibilities." Terry v. Ashcroft, 336 F.3d 128, 138 (2d Cir. 2003) (internal quotations marks omitted). "Examples of materially adverse changes include termination of employment, a demotion evidenced by a decrease in wage or salary, a less distinguished title, a material loss of benefits, significantly diminished material responsibilities, or other indices . . . unique to a particular situation." Id. (internal quotations marks omitted). Additionally, the Second Circuit has held that adverse employment actions may include "discharge, refusal to hire, refusal to promote, demotion, reduction in pay and reprimand," Morris v. Landau, 196 F.3d 102, 110 (2d Cir. 1999) and "are not limited to 'pecuniary emoluments,'" Treglia v. Town of Manlius, 313 F.3d 713, 720 (2d Cir. 2002). See Phillips v. Bowen, 278 F.3d 103, 109 (2nd Cir. 2002). District courts within the Second Circuit have often found, however, "that reprimands, threats of disciplinary action and excessive scrutiny do not constitute adverse employment actions in the absence of other negative results such as a decrease in pay or being placed on probation." Honey v. County of Rockland, 200 F. Supp. 2d

311, 320 (D. Conn. 2002); see Bennett v. Watson Wyatt & Co., 136 F. Supp. 2d 236, 248 (S.D.N.Y. 2001); Stembridge v. City of New York, 88 F. Supp. 2d 276 (S.D.N.Y. 2000); Uddin v. City of New York, 427 F. Supp. 2d 414, 429 (S.D.N.Y. 2006).

Abraham alleges that the seven-day "paper" suspension was an adverse employment action. The court agrees. A seven-day "paper" suspension is a more serious action than a formal, written reprimand, as it is the second step in the progressive discipline process at the Postal Service, a formal reprimand (Letter of Warning) being the first. Further, the Postal Service told Abraham that the seven-day "paper" suspension had an equivalent degree of seriousness as if Abraham had been suspended without pay. The written note given to Abraham read:

> While you will not serve time off with this seven (7) day suspension, it has the equivalent degree of seriousness as if you had served time-off without pay. This action is intended to correct the deficiencies described above and should be taken seriously. It is more serious than a letter of warning. Future deficiencies will result in more severe disciplinary action being taken against you. Such action may include a fourteen (14) day time-off suspension or removal form the Postal Service.

(Dkt. # 25, Ex B pp. 1-2.) Because the Second Circuit has held that a reprimand may constitute an adverse employment action, a more serious sanction would also qualify as an adverse employment action. See Morris, 116 F. 3d at 110; Phillips, 278 F.3d at 109; Frasure v. Principi, 367 F. Supp. 2d 245, 256 (D. Conn. 2005) (holding that employer's notice of its decision to formally reprimand plaintiff for allegedly failing to comply with an order from a supervisor qualified as an adverse employment action); McInnis v. Town of Weston, 375 F. Supp. 2d 76, 84 (D. Conn. 2005) (holding that "[a]dverse employment actions include . . . reprimand"). In addition, the seven-day "paper" suspension also qualifies as an adverse employment action under the reprimand plus other negative results standard, as: 1) the seven-day "paper" suspension is the

9

second step in the Postal Service's progressive discipline process, which meant that Abraham was subject to a reprimand; and 2) the seven-day "paper" suspension entails "other negative results," as the Postal Service stated it was as serious as a suspension without pay and equivalent to being placed on probation as further deficiencies would result in termination.

The Postal Service argues that Abraham did not suffer an adverse employment action as the "ultimate result of the action had no lasting effect on the plaintiff." According to the Postal Service, Abraham suffered no adverse employment action because his seven-day "paper" suspension was, after one month, reduced to a formal Letter of Warning and, due to Abraham's good behavior for the following five months, the Letter of Warning was reduced to an "official discussion."[7] The court disagrees with the Postal Service. Although the Postal Service eventually disciplined Abraham with an "official discussion," in the court's estimation, a reasonable finder of fact could consider one month between the "paper" suspension and the Letter of Warning, and the five months between the Letter of Warning and "official discussion," to be a disciplinary probation period. The Second Circuit, and courts within this circuit, have found that being placed on probation may constitute an adverse employment action. See, e.g., Slattery v. Swiss Reinsurance Am. Corp., 248 F.3d 87, 95 (2d Cir. 2001) ("It cannot be questioned that [the plaintiff] has established the first two elements of a prima facie case. . . . [The plaintiff's] probation . . . constituted [an] adverse employment action[].); Honey, 200 F. Supp. 2d at 320.

Furthermore, the Postal Service's position fails from a policy perspective as it would allow employers who have violated Title VII by subjecting an employee to an adverse

---

[7]As the court noted above, an "official discussion" is not maintained in any file or record.

10

employment action with discriminatory intent to avoid sanctions by nullifying the adverse employment action at a later date. Under the Postal's Service's logic, it could subject an employee to an adverse employment action for six months (such as one month for a seven-day "paper" suspension and five months for an official Letter of Warning), yet avoid any Title VII liability by reducing the sanction to something less than what qualifies as an adverse employment action. The court discounts such logic. In addition, the Postal Service argues that there was no adverse employment action taken against Abraham because there was no lasting effect on him. Even assuming there was no lasting effect on Abraham, the Postal Service's argument fails as it is similar to an Title VII remedies argument the Supreme Court recently rejected in Burlington Northern and Santa Fe Ry. Co. v. White, 126 S. Ct. 2405 (2006). In White, the defendant in a discrimination action argued that a thirty-seven day suspension without pay lacked statutory significance because the plaintiff was ultimately reinstated with back pay. Id. at 2417. The Supreme Court rejected that argument, stating that Congress amended Title VII in 1991 to permit victims of intentional discrimination to recover both compensatory and punitive damages. Id. As the Supreme Court noted, these additional remedies were necessary to "help make the victims whole. . . . We would undermine the significance of that congressional judgment were we to conclude that employers could avoid liability in these circumstances." Id. (internal quotation marks and citations omitted).[8]

Finally, the court points out that Abraham's burden in establishing his prima facie case here is minimal and requires no evidence of discrimination. James, 233 F. 3d at 153-54; see

---

[8]The court is aware that much of the White decision discussed the standard for Title VII retaliation claims. The portion of White discussing Title VII remedies, however, did not limit itself to retaliation claims only, and appears to apply to all categories of Title VII claims.

11

Williams v. R.H. Donnelley, Corp., 368 F.3d 123, 126 (2d Cir. 2004) ("[a] plaintiff's burden of establishing a prima facie case is de minimis"). In the instant case, the Postal Service's sole argument against Abraham's substantive Title VII claim is that Abraham did not satisfy the third prong of the prima facie case, i.e., Abraham was not subjected to an adverse employment action. As discussed above, the court has determined that a reasonable finder of fact could consider the actions taken against Abraham to be adverse employment actions. Thus, Abraham has satisfied the minimal requirements of a prima facie Title VII case. The Postal Service has not made any further argument with regard to Abraham's substantive discrimination claim. Consequently, with regard to Abraham's substantive discrimination claim, the Postal Service's motion for summary judgment is **DENIED**.

## C. RETALIATION CLAIM

Title VII prohibits retaliation against employees who exercise rights protected by the statute. See 42 U.S.C. § 2000e-3(a). Abraham, in his amended complaint, makes a retaliation claim, alleging that the seven-day "paper" suspension, in addition to being motivated by his ethnicity, was issued in retaliation for Abraham's earlier complaints of harassment. The Postal Service argues that Abraham's retaliation claim should be dismissed because the he has not exhausted his administrative remedies with respect to his retaliation claim. Specifically, the Postal Service argues that Abraham failed to raise the retaliation claim in his Equal Employment Opportunity ("EEO") complaint, either when it was filed or at anytime thereafter. The court agrees with the Postal Service.

"Title VII requires that an employment discrimination claimant pursue administrative procedures before commencing a lawsuit and imposes a deadline for the initiation of such

procedures." Fitzgerald v. Henderson, 251 F.3d 345, 359-60 (2d Cir. 2001). Under Title VII, a private sector employee claimant may bring suit in federal court only if he has first filed a complaint with the Equal Employment Opportunity Commission ("EEOC") and obtained a right-to-sue letter. Legani v. Alitalia Linee Aeree Italiane, S.P.A., 274 F.3d 683, 686 (2d Cir. 2001). The "exhaustion of administrative remedies through the EEOC is 'an essential element' of the Title VII . . . statutory schemes, and, as such, a precondition to bringing such claims in federal court. Id. (internal citations omitted). The requirement that a federal employee bring a complaint to his or her EEO office for resolution is analogous to the requirement for non-federal employees. See Fitzgerald, 251 F.3d at 359-60; Terry, 336 F.3d at 150.

The requirement that a claim be first raised with the EEO office is not, however, a jurisdictional one. "As the Supreme Court has stated, filing a timely charge of discrimination with the EEOC is . . . a requirement that, like a statute of limitations, is subject to waiver, estoppel, and equitable tolling." Terry, 336 F.3d at 150 (internal quotation marks omitted). The Second Circuit has held that

> [w]here there exists a requirement that a Title VII claim first be presented to the federal EEOC, we have recognized three situations in which claims not raised in an EEO charge are sufficiently related to the allegations in the charge that it would be unfair to civil rights plaintiffs to bar such claims in a civil action: 1) where the conduct complained of would fall within the scope of the EEOC investigation which can reasonably be expected to grow out of the charge of discrimination; 2) where the complaint is one alleging retaliation by an employer against an employee for filing an EEOC charge; and 3) where the complaint alleges further incidents of discrimination carried out in precisely the same manner alleged in the EEOC charge.

Id. at 151 (internal quotation marks omitted).

In the instant case, Abraham argues his retaliation claim falls within the "reasonably

13

related" exceptions to the exhaustion requirement. The court disagrees. For the first "reasonably related" exception to apply, the conduct complained of must fall within the scope of the EEOC investigation, which can reasonably be expected to grow out of the charge of discrimination. "There must be some factual or legal nexus between the substance of the allegations contained in the administrative charge and the new cause of action. Retaliation is a theory of liability that is substantively distinct from [an] age discrimination claim." O'Hara v. Memorial Sloan-Kettering Cancer Center, 27 Fed. Appx. 69, 70 (2d Cir. 2001). "The scope of an EEOC investigation cannot reasonably be expected to encompass retaliation when [a plaintiff has] failed to put the agency on notice that []he had engaged in the type of protected activity that is the predicate to a retaliation claim." Id. at 70-71. The materials submitted by the parties contain no indication that Abraham put the EEOC on notice that he engaged in the type of protected activities (e.g., opposing racial discrimination in the workplace) needed to support a retaliation claim. From what the court can discern, Abraham asserts in his complaint that he was retaliated against for his opposition to harassment at work.[9] Such an assertion is insufficient, however, to put the EEOC on notice that Abraham engaged in protected activities. Therefore, without any such notice, Abraham's retaliation claim is not saved by the first "reasonably related" exception to the exhaustion requirement.

The second "reasonably related" exception—one that alleges retaliation by an employer against an employee for filing an EEOC charge — also does not apply here. The Second Circuit has stated that, with regard to the second category of the "reasonably related" exceptions, where there is a "close connection of the retaliatory act to both the initial discriminatory conduct and

---

[9] Abraham provides no specifics as to what this opposition to harassment entailed.

the filing of the charge itself," the exhaustion requirement is relaxed because

> The EEOC already will have had the opportunity to investigate and mediate the claims arising from the underlying discriminatory acts alleged. Due to the very nature of retaliation, the principle benefits of EEOC involvement, mediation of claims and conciliation, are much less likely to result from a second investigation. Indeed, requiring a plaintiff to file a second EEOC charge under these circumstances could have the perverse result of promoting employer retaliation in order to impose further costs on plaintiffs and delay the filing of civil actions relating to the underlying acts of discrimination.

Butts v. City of N.Y. Dep't of Hous. Preservation and Dev., 990 F.2d 1397, 1402 (2d Cir. 1993), superceded by statute on other grounds as recognized in Hawkins v. 1115 Legal Serv. Care, 163 F.3d 684 (2d Cir. 1998); see Ziemba v. Slater, No. 98 Civ. 918, 1999 WL 66215, at *5 (D. Conn. Feb. 10, 1999) (close temporal proximity of plaintiff's administrative appeal prior to notification of termination met the "reasonably related" standard).

Abraham's retaliation claim, though, is based solely on events that occurred prior to the filing of his EEO complaint. In the amended complaint, Abraham states that the "discriminatory treatment and adverse conduct . . . was in retaliation for his complaints of harassment." (Dkt. # 10 ¶ 17.) The "discriminatory treatment and adverse conduct" described in the amended complaint involve only the circumstances surrounding the seven-day "paper" suspension, which occurred before Abraham filed his EEO complaint. When the alleged retaliation is not based on actions subsequent to the filing of the EEOC charge, the relaxed exhaustion requirement described above does not apply. See Melendez v. Int'l Serv. Sys., Inc., No. 97 CIV. 8051 DAB, 1999 WL 187071 at *8 (S.D.N.Y. April 6, 1999). Thus, Abraham's retaliation claim does not

fall within this exception to the exhaustion requirement.[10]

Abraham's argument regarding the applicability of the third category of the "reasonably related" exceptions to the exhaustion requirement (i.e., when a plaintiff alleges other incidents of discrimination carried out in precisely the same manner alleged in the EEO charge) is also without merit. In his amended complaint, Abraham alleges no further incidents of discrimination, but rather refers only to the circumstances surrounding his seven-day "paper" suspension. Thus, Abraham's retaliation claim is not saved by this exception to the exhaustion requirement. Therefore, the court finds that Abraham failed to exhaust his administrative remedies for his retaliation claim, which is not saved by the exceptions to the exhaustion requirement. Consequently, with regard to Abraham's retaliation claim, the Postal Service's motion for summary judgment is **GRANTED**.

## D. HOSTILE WORK ENVIRONMENT CLAIM

Abraham, in his amended complaint, brings a hostile work environment claim. Specifically, Abraham claims that the Postal Service, through its servants, employee and agents, discriminated against Abraham by creating, facilitating, condoning, and failing to intervene and prevent an openly hostile work environment. The Postal Service argues that Abraham's hostile work environment claim should be dismissed because he has not exhausted his administrative

---

[10] The court notes that, in his 56(a)(2) Statement and opposition memorandum, Abraham does allege, for the first time, retaliation for filing this action. Specifically, Abraham alleges that the Postal Service retaliated against him by giving him a Progressive Discipline Interview for intentionally jamming a strapping machine at work in January 2006. Abraham denies intentionally jamming the machine. This allegation is obviously insufficient to sustain the first "reasonably related" exception to the exhaustion requirement because this incident occurred after Abraham filed this action and would not have fallen within the scope of the EEOC's investigation. In addition, with regard to the second and third "reasonably related" exceptions to the exhaustion requirement, this allegation is not properly before the court, as it was not included in Abraham's EEO complaint, his original complaint, or his amended complaint. An opposition memorandum and 56(a)(2) Statement are not the proper vehicles to bring forth a new retaliation claim. Consequently, the court shall not consider this incident in its analysis.

remedies with respect to that claim. Specifically, the Postal Service argues Abraham failed to raise the hostile work environment claim in his EEO complaint either when it was filed or at anytime thereafter.

The court disagrees with the Postal Service's argument here. The court has already set forth the standard for exhaustion of administrative remedies, and need not restate it. Needless to say, Abraham was required to allege his hostile work environment claim in his EEO complaint. In support of its summary judgment motion, the Postal Service itself submitted the June 17, 2004 Investigative Affidavit for Abraham's EEO complaint (case number 1B-065-0015-04), which contains the following statement by Abraham:

> The hostile work environment to which I have been subjected has caused psychological, emotional and physical trauma for which I should be reasonably compensated. Moreover, to the extent this suspension remains in my personnel records, I am more vulnerable to termination even taking into consideration principles of progressive discipline. Finally, because this issue is on my record, I am ineligible for a transfer . . . .

(Dkt. # 25, Ex. A p. 6.) Based on the above statement, the court finds that Abraham did, in fact, raise a hostile work environment claim as part of his EEO case.[11] Consequently, with regard to Abraham's hostile work environment claim, the Postal Service's motion for summary judgment is **DENIED**.[12]

---

[11] The court notes that Abraham, in his opposition memorandum, states that he "did not specifically raise the precise claims of retaliation and hostile work environment as part of his EEO complaint." (See dkt. # 30 p. 8.) The court considers this statement to be, in part, an oversight, as it is clear from the Investigative Affidavit that Abraham did, in fact, raise a hostile work environment claim.

[12] In the memorandum of law in support of its motion for summary judgment, the Postal Service requests that, if the court finds Abraham's retaliation and hostile work environment claims to be properly before the court, it be permitted to file an additional motion for summary judgment to reach the merits of those claims. The court declines, however, to protract this case any further. If the Postal Service wished to argue the merits of these claims, or if it wished to conduct a more thorough analysis of Abraham's substantive discrimination claims under

## III. CONCLUSION

For the foregoing reasons, the Defendant's motion for summary judgment **(dkt. # 23)** is **GRANTED in part** and **DENIED in part**. With regard to the Plaintiff's Title VII retaliation claim, the Defendant's motion for summary judgment **(dkt. # 23)** is **GRANTED**. With regard to the Plaintiff's Title VII discrimination claim and hostile work environment claim, the Defendant's motion for summary judgment **(dkt. # 23)** is **DENIED**. The parties shall file their joint trial memorandum on or before August 31, 2007. This case shall be ready for trial in October 2007.

SO ORDERED this 11th day of July, 2007.

/s/DJS
**DOMINIC J. SQUATRITO
UNITED STATES DISTRICT JUDGE**

---

McDonnell Douglas, it should have done so in its original summary judgment motion. Thus, the Postal Service's request in this regard is **DENIED**.